(C.D. 4054)

AMPLIFONE CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 24, 1970)

*Schwartz & Lidstrom* (*Barnes, Richardson & Colburn, Joseph Schwartz,* and *Peter J. Fitch* of counsel) for the plaintiff.
*William D. Ruckelshaus,* Assistant Attorney General (*Bernard J. Babb* and *Jeffrey D. Latten,* trial attorneys), for the defendant.

Before RICHARDSON, LANDIS, and ROSENSTEIN, Judges

RICHARDSON, Judge: The merchandise covered by this protest consists of horizontal output transformers used in the manufacture of television receiving sets which were exported from Canada in 1967, entered at Chicago, Ill., and classified in liquidation under the provision for transformers in item 682.10 of the Tariff Schedules of the United States at the duty rate of 12.5 per centum ad valorem, with duty allowance made pursuant to item 807.00 of the tariff schedules for certain parts of American origin incorporated in the transformers. The sole claim of the plaintiff-importer is that additional allowances should have been made in the liquidation of the imported articles for other "product[s] of the United States" pursuant to the provisions of item 807.00 of the tariff schedules.

The articles for which duty allowance was made by the district director in liquidation pursuant to item 807.00 as aforesaid are contained in the foreign shipper's declaration in an affidavit entitled "American Goods Affidavit." These articles are:

| | |
|---|---|
| resinite coil form | air gap |
| 11¾" bradex wire | 31" lead wire |
| kraft paper spacer | 2¼" black sleeving |
| eyelet | 2" brown sleeving |
| 5" lead wire | 2¼" red sleeving, H.W. |
| plate cap | 2⅜" green sleeving |
| plate cap spring | 2⅛" white sleeving |
| terminal board UTR | 2⁷⁄₁₆" yellow sleeving |
| control, minus shaft | 2⁷⁄₁₆" clear sleeving |
| iron core | 2½" vinylglass sleeving |
| sponge rubber | ½" neoprene sleeving |
| aluminum frame | wrapper |
| steel frame | carton |

At the trial counsel for the parties stipulated that an allowance in duty had been made for the aforementioned articles under item 807.00, and that, therefore, said articles were not in issue under the protest herein. Notwithstanding this stipulation, however, we find included in the list of grievances recited in plaintiff-importer's brief a claim for an allowance for the resinite coil form, bradex wire, kraft paper spacer, and eyelet, among other articles. It is to be noted that these four articles are among the articles set forth in the "American Goods Affidavit" and included in counsel's stipulation of articles for which an allowance had been made. It appears from the record that the rationale of the district director in making the duty allowances for these four articles and the other articles contained in said affidavit is that such articles were all cut or made to size before exportation from the United States. And in this regard the duty exempt articles differ from the remainder of the articles for which plaintiff claims a duty exemption under item 807.00.

Item 807.00 of the tariff schedules, as amended, reads as follows:

> Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting_____ A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart)

The products for which additional duty allowance is actually claimed herein by plaintiff consist of: yellow paper tape, acetate cloth tape, convergence wire, two kinds of magnet wire, resinite tube, kraft paper tube, two kinds of kraft paper, acetate, and two kinds of wax. According to the testimony of Theodore F. Handing, executive vice-president of the plaintiff corporation, these products were fabricated in the United States, exported to Amplifone Canada, Limited, in Canada, and used there in the same fabricated form together with other parts in the assembly of one or other of two coils (i.e., high and low voltage coils) which are contained in the imported transformers. And it was also established in the testimony of this witness (who indicated that he has some engineering background and that he participated in the setting up of the Canadian operation) that the tapes

were exported in rolls and dispensed and cut abroad, that the wires were exported on spools and wound on coil forms and cut abroad, that the tubes were exported in 22- and 25-inch lengths and cut to size abroad, that the kraft papers were exported in sheets and cut to size abroad, that the acetate was exported in sheets and cut to size abroad, and that the waxes were exported in blocks and melted and applied in molten form abroad.

No testimony was adduced from the witness, or otherwise appears in the record, relative to the "assembly" of the imported transformers themselves, nor as to the use or uses of the involved products *per se* in the condition as exported to Canada. However, a sample of the imported transformers is in evidence, marked plaintiff's exhibit 1. And also in evidence as plaintiff's illustrative exhibit 2 are a series of photographs depicting some of the products in issue in the Canadian plant along with some machinery, equipment and personnel by means of which and through whom these and other products are made into the coils that become part of the imported transformers.

Plaintiff contends that the American made products in question are fabricated components that were subjected abroad only to a process of assembly to form the imported transformers. Defendant argues that the articles in issue are "materials susceptible of numerous uses, not yet committed to any particular use, and which by their very existence in bulk quantities require additional cutting, shaping, sizing and/or other fabrication in order to become parts of any article, and therefore, can not be considered as parts which in themselves are finished, manufactured products."

As we read item 807.00 of the tariff schedules the *sine qua non* to the duty allowance provided for therein is the assembly abroad of the imported article with *fabricated components*, the product of the United States. In the instant case no evidence has been adduced to the effect that the imported transformers are in fact *assembled* articles, as distinguished from some other mode of creation. But even if it can be assumed for purposes of this case that the transformers are *assembled* articles (owing to the allowances made in classification under item 807.00 for certain items not here in issue), the question remains as to whether the items for which additional duty allowances are claimed herein perforce of item 807.00 were in fact "fabricated components, the product of the United States" at the time of exportation from the United States.

That each of the items in dispute is a fabricated product *per se* within the multi-faceted meaning of the root word "fabricate" is not doubted by us. However, the word "fabricate" is also defined to mean, among other things:

2 To make by combining parts; assemble. [Funk & Wagnalls Standard Dictionary International Edition (1963 edition).]

1 . . . b: to form into a whole by uniting parts: CONSTRUCT, BUILD * * * [Webster's Third New International Dictionary (1961 edition).]

And the word "component" is defined by the same lexicons to mean:

1 A constituent part. [Funk & Wagnalls (1963).]

1: a constituent part: INGREDIENT * * * [Webster's Third (1961).]

And the word "constituent" as used by these lexicons in their definition of the word "component" is defined by them to mean:

1 Serving to form or compose as a necessary part [Funk & Wagnalls (1963).]

1: serving to form, compose, or make up a unit or whole * * * [Webster's Third (1961).]

It is clear from contemporary definitions of the root words comprising the statutory term "fabricated components" that that term has reference to a combination of parts forming an integral unit of an article. And we find nothing in the legislative history of item 807.00 which suggests that the term "fabricated components" is to have any meaning other than its common meaning.* In fact, the condition in clause (a) of item 807.00, that the components assembled abroad "were exported in condition ready for assembly without further fabrication" is complimentary of the common understanding of the term "fabricated components." And so too is the language of the House Ways and Means Committee report on the bill H.R. 7969, embodying the changes in item 807.00 under discussion here which were adopted by the Congress as proposed in the House of Representatives. House Report No. 342 reads in part (page 49):

> The U.S. components would be specifically limited to "fabricated" components exported "in condition ready for assembly without further fabrication" which do not lose "their physical identity" in the assembled article "by change in form, shape, or otherwise." Thus, item 807.00 would apply with respect to components of types which are designed to be fitted together with other components and would not apply to chemical products, food ingredients, liquids, gases, powders, etc.

*2 U.S. Code Cong. & Adm. News '65, pages 3448 and 3449; H. Rept. 342, 89th Cong., 1st Sess. on H.R. 7969, page 49.

The amended item 807.00 would specifically permit the U.S. component to be advanced or improved "by operations incidental to the assembly process such as cleaning, lubricating, and painting." It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. For example, in fitting the parts of a machine together, it may be necessary to remove rust; to remove grease, paint, or other preservative coatings; to file off or otherwise remove small amounts of excess material; to add lubricants; or to paint or apply other preservative coatings. It may also be necessary to test and adjust the components. Such operations, if of a minor nature incidental to the assembly process, whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad.

Thus, it would appear by the presence of clause (a) above noted that by this language Congress did not intend, for application of item 807.00 treatment, to permit a greater division of labor between American and foreign sources in connection with the handling and manipulation of American made goods in the assembly of an imported article than would respond to the designation and be identified as a *completed* unit assembled into the article imported.

Examination of the sample transformer received in evidence as exhibit 1 indicates that it is composed of a number of complete units. The coils with lead wires are two of such units. The steel frame another—the outer aluminum frame another—the sponge rubber interlining between the two frames another—the terminal board with mounted metal parts another—and a black coded lead wire looped around the low voltage coil still another. Each of these units relates directly to the transformer as an integral part thereof, ready for incorporation therein. We think it is such complete units as these that the term "fabricated components" is addressed to.

The exported products here involved concern only two of the aforementioned units of the imported transformers, namely, the coils. And even at this, they are not in such a state of readiness at the time of exportation as to be capable of being incorporated into the coils, which, of course, is not the imported article. In such state, it may well be, for all the record shows, that each of the exported products in issue lends itself to usage for a hundred and one different purposes. In this state these products are at best described as fabricated products. It is only when they are subjected, while abroad in a foreign country, to measuring, cutting, winding, melting, etc., that these products can properly be described as component materials for transformer coils. And it is only after the resultant products are incorporated into the coils that the coils themselves become components in a state of readiness for incorporation into the transformers.

Of course, the mere cutting abroad of a ready made *component* of American origin for purposes of fitting it to a foreign made *component* would not disqualify the American *component* for the duty exemption provided for in item 807.00. See *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 62 Cust. Ct. 643, C.D. 3840, 304 F. Supp. 1187 (1969), involving American made component (polyester film) exported on rolls and while abroad unrolled, joined with a foreign made component (polyethylene film) and cut, thus forming the imported, assembled article. However, the cutting abroad, among other operations, of American parts such as in this case to *form a component* is something else again, involving two successive assembly or fabrication processes in the foreign country, namely, the assembly of an American component, and then the assembly of the imported article with the American component. It is this dual assembly or fabrication feature which characterizes the instant case and thus distinguishes the cutting operation here involved from that involved in C.D. 3840. And as we read item 807.00 it does not contemplate two or more assembly processes abroad with respect to American articles *vis-a-vis* the imported article.

Under all the circumstances disclosed by this record we are of the opinion that the exported products do not come within the scope of the term "fabricated components, the product of the United States" as used in item 807.00 of the tariff schedules. As such, we are in accord with the argument advanced herein by defendant as hereinbefore noted and with the further argument recorded at page 12 of defendant's brief wherein it is stated ". . . the instant case involves the cutting and forming of *bulk materials* into *component parts*, *not* the mere *trimming* of *slight* amounts of excess material from an item already substantially completed." It, therefore, follows that the duty allowance claimed for the products in issue pursuant to item 807.00 of the tariff schedules is not applicable, and was properly disallowed by the district director. The protest is overruled.

Judgment will be entered herein accordingly.