(C.D. 4263)

GENERAL INSTRUMENT CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

(Decided September 3, 1971)

*William R. Shapiro; Lincoln and Stewart (Eugene L. Stewart* of counsel), associate counsel; for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Robert Blanc,* trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges

RICHARDSON, Judge: The merchandise in this case consists of capacitors which were exported from Taiwan in January, 1967, entered

at New York, and classified in liquidation under the provision for electrical capacitors in item 685.80 of the Tariff Schedules of the United States. An allowance was made in liquidation pursuant to item 807.00 of the Tariff Schedules for certain American made parts of the involved capacitors, namely, aluminum can, rubber bakelite washer, aluminium rivet, and wire leads. It is claimed in the protest that additional allowances under item 807.00 should have been made in liquidation for other articles of American origin incorporated in the imported capacitors, namely, foil, tape, paper, tabs, washer ends and mylar insulators. The washer ends were withdrawn by plaintiff's counsel at the trial from the group of articles for which an allowance under item 807.00 is claimed, counsel having noted on the record that the regional commissioner made an allowance therefor.

Item 807.00 provides for an exemption from duty for:

807.00    Articles assembled abroad in whole or in
          part of fabricated components, the product
          of the United States, which (a) were ex-
          ported in condition ready for assembly
          without further fabrication, (b) have not
          lost their physical identity in such articles
          by change in form, shape, or otherwise,
          and (c) have not been advanced in value or
          improved in condition abroad except by
          being assembled and except by operations
          incidental to the assembly process such as
          cleaning, lubricating, and painting_____    * * *

The essential facts of this case are not in dispute. The disputed articles were shipped by plaintiff on rolls together with other articles to its plant in Taiwan where together they were used in the production of the imported capacitors. Two kinds of aluminum electrolytic capacitors are involved, namely, the tubular 729 series capacitor, and the subminiature 974 series capacitor. The evidence of record consists of the testimony of plaintiff's production engineer responsible for materials specifications, and its executive vice president of component operations, and a series of display boards prepared under the direction of said engineer received in evidence as plaintiff's collective exhibits 1 through 4 and plaintiff's exhibits 5 and 6. In sum this evidence describes the nature of the materials for which duty allowance is claimed, and the various steps employed in the Taiwan plant and elsewhere in utilizing these materials, and points out the economies achieved by plaintiff in its *modus operandi*. Counsel for the plaintiff sums up the evidence in its brief with the following statement (p. 10):

> The assembly of a capacitor is essentially a simple process in which a sandwich is made out of two metal foils with paper in between. This assembly is then rolled up and immersed in an electro-

lyte [chemical solution], and placed in a can with electrical connections.

While counsel's statement is, perhaps, an oversimplification of what is actually done in the foreign country to produce the imported capacitors, nevertheless, the statement does accurately size up the situation with respect to the role of the involved articles in the Taiwan operation for which duty exemption under item 807.00 is claimed herein. There is no question but that the evidence adduced by plaintiff conclusively establishes that all of the disputed articles, including the Scotch tape, are used in the Taiwan plant to produce a complete capacitor roll in the state or condition illustrated by step No. 8 on board A–3 of collective exhibit 3 (729 series capacitor) and by step No. 9 on board B–2 of collective exhibit 4 (974 series capacitor). What other uses the disputed articles *per se* may have has not been developed in this record.

In the 729 series capacitor the *capacitor roll*, as illustrated, has an aluminum strip, termed a cathode tab [which is connected to the rolled cathode foil], projecting from one end, constituting the means of connection to a negative lead, and an aluminum strip, termed an anode tab [which is connected to the rolled anode foil], projecting from the other end, constituting the means of connection to a positive lead. In the 974 series capacitor the *capacitor roll*, as illustrated, also has a cathode tab as in the 729 series. But at the anode end there is no tab. In its place there is a positive lead [whose riser is connected to the rolled anode foil] which is inserted through a round rubber bung positioned at this end of the capacitor roll. Plaintiff's engineer witness described the disputed articles which have been utilized abroad in producing these capacitor rolls as "component materials." (R.12, 18–19).

Upon completion of the capacitor rolls as aforesaid, the evidence shows that the following steps are taken in the Taiwan plant prior to the exportation of the subject capacitors to the United States:

The capacitor roll is immersed in an electrolytic solution from which the saturated roll is removed and inserted at the cathode tab end into housing which consists of a cylindrical aluminum can in which melted pitch has been placed to secure the capacitor roll against movement inside the can. The cathode tab is welded to the inside of the closed end of the can, and at some point a negative lead is welded to the outside of this closed end of the can. In the 729 series capacitor, at the time of or prior to insertion of the capacitor roll into its housing, a rubber bakelite washer into which a "T" shaped aluminum rivet has been inserted is positioned against the anode tab and a connection is made by welding the anode tab to the base end of the rivet. And, also at this time, a positive lead is welded

to the head of the rivet. Closure of the housing in both types of capacitors is made by rolling the edges of the open end of the can around the edges of the washer or bung, as the case may be, and indenting the metal against the underside of the washer or bung to form a seal. The capacitor is then charged and tested to establish its electrical properties, after which a protective plastic coating is applied to the housing by a process of heat shrinking. The capacitor is re-charged and retested. It is then ready for shipment to the United States.

Plaintiff's initial contention is that the "component materials" in question are fabricated components, the product of the United States. Plantiff argues (brief, p. 22):

> * * * It is obvious from the materials themselves that the metal foil, tabs, paper, tape, and Mylar insulators are fabricated materials. The evidence of record establishes that these component materials were in fact used in the assembly of the imported articles. * * *
>
> Accordingly, there is no issue in the case as to the fact that the imported capacitors are articles which were assembled abroad in whole or in part of fabricated components, the product of the United States, * * *.

Defendant counters with the contention that the merchandise at bar is not encompassed by item 807.00, citing this court's decision in *Amplifone Corporation* v. *United States*, 65 Cust. Ct. 58, C.D. 4054 (1970). Defendant argues (brief, p. 11) that this case involves:

> a process which in reality is two successive assembly or fabrication processes. The first process is the forming of components for the capacitor, and the second is the joining together of these components to form the imported articles.

We agree with the defendant. In this case the evidence as noted above clearly shows that the assembly of the imported capacitors in Taiwan *awaits* the creation there of a capacitor roll. And the capacitor roll is the component produced or created with the exported articles in dispute in the instant case. Therefore, since the capacitor roll component is made in Taiwan the materials of its composition are not, at the time of exportation from the United States, components of the imported capacitors, but rather are at that time materials with which a component of said capacitors, namely, the capacitor roll, is yet to be produced. Indeed, plaintiff's own expert witness, while he did not identify a particular component as we do here, labeled the disputed articles as "component materials."

In *Amplifone Corporation* v. *United States*, *supra*, the imported merchandise consisted of horizontal output transformers for television receiving sets imported into the United States from Canada, and the

importer claimed exemptions from duty pursuant to item 807.00 on certain American made articles incorporated into the transformers which had been disallowed in liquidation by the district director. The disputed articles in that case consisted of tape exported in rolls and cut abroad, wires exported on spools and wound and cut abroad, paper and acetate exported in sheets and cut abroad, and waxes exported in blocks and melted abroad. All of these articles were used in Canada in the production of high and low voltage coils subsequently installed in the imported transformers. This court, after reviewing the ordinary meaning of the term "fabricated components" and the legislative history of the employment of that term in item 807.00, came to the conclusion that the term "fabricated components" as used by Congress in item 807.00 relates to complete units of the imported transformers, that the disputed articles did not severally constitute such a unit at the time of their exportation from the United States so as to come within the ambit of said term, and that as such, the duty exemption sought by the importer was properly disallowed by the district director.

We said in *Amplifone*, among other things (p. 63) :

> The exported products here involved concern only two of the aforementioned units of the imported transformers, namely, the coils. And even at this, they are not in such a state of readiness at the time of exportation as to be capable of being incorporated into the coils, which, of course, is not the imported article. In such state, it may well be, for all the record shows, that each of the exported products in issue lends itself to usage for a hundred and one different purposes. In this state these products are at best described as fabricated products. It is only when they are subjected, while abroad in a foreign country, to measuring, cutting, winding, melting, etc., that these products can properly be described as component materials for transformer coils. And it is only after the resultant products are incorporated into the coils that the coils themselves become components in a state of readiness for incorporation into the transformers.

The facts and issue at bar are essentially the same as those in the *Amplifone* case. Accordingly, we follow here our decision in that case. The disputed articles at bar were not complete units of the imported capacitors at the time of their exportation from the United States, and as such, were not "fabricated components" as that term is used in item 807.00. Consequently, the duty exemption sought by plaintiff under that statute with respect to the disputed articles was properly disallowed by the regional commissioner of customs. The protest is overruled.

Judgement will be entered accordingly.