JOHN V. CARR & SON, INC. and Paccar Inc., d/b/a Dynacraft Company

v.

UNITED STATES.

C.D. 4652, Court No. 72-8-01766.

United States Customs Court.

May 28, 1976.

Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash. (Benjamin G. Porter, Seattle, Wash., of counsel), for plaintiffs.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (John A. Gussow, New York City, and Mark K. Neville, Jr., trial attys.), for defendant.

MALETZ, Judge:

This action involves the proper tariff classification of importations described on the special customs invoice as "Dynacraft Hose SAE J1402 Type D." The hose was manufactured by the Goodyear Tire & Rubber Company of Canada, Limited, at Collingwood, Ontario, Canada, and imported in September 1971 by the Dynacraft Company, a division of Paccar Inc., Bellevue, Washington, one of the plaintiffs herein. Plaintiff John V. Carr & Son, Inc. is a customs broker, agent and attorney in fact for the importer.

The imported merchandise was classified by the government under item 772.65 of the Tariff Schedules of the United States as hose and tubing of rubber or plastics and assessed duty at the rate of 5 percent ad valorem. Plaintiffs challenge this classification and contend that the imported hose is properly classifiable under item 772.66 as a Canadian article and original motor vehicle equipment and thus free of duty.

Statutes Involved

772.65 Hose, pipe, and tubing, all the foregoing not specially provided for, of rubber or plastics, suitable for conducting gases or liquids, with or without attached fittings . . . .5 % ad val.

772.66 If Canadian article and original motor-vehicle equipment (see headnote 2, part 6B, schedule 6) . . . . . . . . . . . . . . . . . . . . Free

Schedule 6, Part 6, Subpart B, headnotes:

* * * * *

2. *Motor Vehicles and Original Equipment Therefor of Canadian Origin.*

(a) The term *"original motor-vehicle equipment"*, as used in the schedules with reference to a Canadian article (as defined by general headnote 3(d)), means such a Canadian article which has been obtained from a supplier in Canada under or pursuant to a written order, contract, or letter of intent of a bona fide motor-vehicle manufacturer in the United States, and which is a *fabricated component* intended for use as original equipment in the manufacture in the United States of a motor vehicle, but the term does not include trailers or articles to be used in their manufacture. [Emphasis added.]

* * * * *

(d) If any Canadian article accorded the status of original motor-vehicle equipment is not so used in the manufacture in the United States of motor vehicles, such Canadian article or its value (to be recovered from the importer or other person who diverted the article from its intended use as original motor-vehicle equipment) shall be subject to forfeiture, unless at the time of the diversion of the Canadian article the United States Customs Service is notified in writing, and, pursuant to arrangements made with the Service—

(i) the Canadian article is, under customs supervision, destroyed or exported, or

(ii) duty is paid to the United States Government in an amount equal to the duty which would have been payable at the time of entry if the Canadian article had not been entered as original motor-vehicle equipment.

AGREEMENT CONCERNING AUTOMOTIVE PRODUCTS BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA, 17 UST 1372 (1966)

The Government of the United States of America and the Government of Canada,

* * * * *

Agree as follows:

* * * * *

Article II

(a) The Government of Canada, not later than the entry into force of the legislation contemplated in paragraph (b) of this Article, shall accord duty-free treatment to imports of the products of the United States described in Annex A.

(b) The Government of the United States, during the session of the United States Congress commencing on January 4, 1965, shall seek enactment of legislation authorizing duty-free treatment of imports of the products of Canada described in Annex B. In seeking such legislation, the

Government of the United States shall also seek authority permitting the implementation of such duty-free treatment retroactively to the earliest date administratively possible following the date upon which the Government of Canada has accorded duty-free treatment. Promptly after the entry into force of such legislation, the Government of the United States shall accord duty-free treatment to the products of Canada described in Annex B.

\* \* \* \* \*

### ANNEX A

1. \* \* \* \* \*

(2) All parts, and accessories and parts thereof, except tires and tubes, when imported for use as original equipment in automobiles to be produced in Canada by a manufacturer of automobiles.

\* \* \* \*

(4) All parts, and accessories and parts thereof, except tires and tubes, when imported for use as original equipment in buses to be produced in Canada by a manufacturer of buses.

\* \* \* \*

(6) All parts, and accessories and parts thereof, except tires, tubes and any machines or other articles required under Canadian tariff item 438a to be valued separately under the tariff items regularly applicable thereto, when imported for use as original equipment in specified commercial vehicles to be produced in Canada by a manufacturer of specified commercial vehicles.

\* \* \* \*

### ANNEX B

(1) Motor vehicles for the transport of persons or articles as provided for in items 692 05 and 692.10 of the Tariff Schedules of the United States and chassis therefor, but not including electric trolley buses, three-wheeled vehicles, or trailers accompanying truck tractors, or chassis therefor.[1]

(2) Fabricated components, not including trailers, tires, or tubes for tires, for use as original equipment in the manufacture of motor vehicles of the kinds described in paragraph (1) above.

(3) Articles of the kinds described in paragraphs (1) and (2) above include such articles whether finished or unfinished but do not include any article produced with the use of materials imported into Canada which are products of any foreign country (except materials produced within the customs territory of the United States) . . . . [2]

Against this statutory background, the only issue in controversy is whether the imported hose is a "fabricated component" within the meaning of headnote 2(a), part 6B, schedule 6 of the tariff schedules, and thus entitled to duty-free entry under item 772.66.

I

The facts are these: Plaintiff Paccar Inc. (formerly known as Pacific Car and Foundry Company) manufactures Peterbilt and Kenworth automotive truck tractors in plants located in the United States and Canada. Kenworth truck tractors are manufactured and sold under the trade name of Kenworth Motor Truck Company, an unincorporated division of Paccar. Peterbilt truck tractors are manufactured under the Peterbilt Motors Company trade name, another unincorporated division of Paccar. The parties agree that Paccar, Peterbilt, and Kenworth are all bona fide motor vehicle manufacturers within the meaning of headnote 2(a), part 6B, schedule 6 of the tariff schedules.

Kenworth and Peterbilt truck tractors are heavy-duty trucks. They are classified in the industry as "Class A trucks"—those with a gross vehicle weight of 33,000 pounds and above—and are used extensively in the logging, construction, and long-distance freight hauling industries. While the Peterbilt and Kenworth trucks are commonly used to pull truck trailers, neither Paccar nor its divisions manufacture trailers. The truck tractors typically travel 140,000 miles per year and are in operation up to 5,000 hours per year. They operate both on and off highways.

Components used in trucks must be designed to perform in a variety of weather

1. As of the time of the signing of this agreement in 1965, items 692.05 and 692.10 of the tariff schedules covered, among other things, automobile truck tractors and automobile trucks.

2. The foregoing Agreement was implemented by the Automotive Products Trade Act of 1965, 19 U.S.C. § 2001 et seq., P.L. 89–283, 79 Stat. 1016 (Oct. 21, 1965).

conditions and temperature extremes, and to withstand vibrations and shocks far more severe than those experienced by components installed in a piece of machinery of similar size and magnitude in a plant. For example, a truck on a single run may travel from arctic cold in Alaska to desert heat in Texas. And at one particular time a piece of hose may be subject to a temperature range of 300 degrees—one end subject to the engine heat and the other to the cold of an Alaskan winter. As a rule of thumb, components used on an over-the-road application must be able to perform under conditions 10 to 20 times more rigorous than automobile applications.

The hose which is the subject of the present suit is purchased by Paccar under its trade name "Dynacraft Company." Dynacraft performs the function of purchasing, inventorying and warehousing various kinds of truck components which are intended for use by the Kenworth and Peterbilt truck manufacturing divisions. The hose is transferred from the Dynacraft division to the Kenworth and Peterbilt divisions by inventory transfers accomplished by appropriate bookkeeping entries.

The subject hose is made by the Goodyear Tire & Rubber Company of Canada, Limited, located at Collingwood, Ontario, Canada (sometimes referred to hereafter as "Goodyear of Canada"). The hose is manufactured in accordance with the Society of Automotive Engineers' ("SAE") specification J1402 Type D Class I. The Society of Automotive Engineers is an automotive industry association which prepares specifications for components used in the automotive field. The SAE J1402 Type D specification delineates performance and construction characteristics which are specifically tailored to the needs and performance characteristics required of an air-brake system during typical truck operations. In this connection, Paccar would be unable to sell vehicles if the hose in its truck air-brake lines did not meet the SAE J1402 Type D specification which is the standard for both the Canadian and United States automotive industries. Indeed, Paccar requires Goodyear of Canada to manufacture the subject hose so it will exceed certain of the minimum J1402 Type D specifications.

The hose is constructed around a rubber tube. The tube itself is made from a special type of synthetic rubber mixed together with other ingredients to form a rubber compound which is specifically manufactured for oil resistant uses and is designed to meet the SAE J1402 Type D specification. The particular artificial rubber compound used to form the rubber tube used in the J1402 Type D hose is used in only three or four of the several hundred types of hose offered by Goodyear of Canada. The various ingredients are compounded by being mixed together in a large mixing machine to form a homogeneous mix. After compounding, the rubber is formed in slabs approximately 30 inches by 60 inches and stored for future use on wooden or metal skids.

When ready to be used, the rubber compound is shredded into strips and fed into an extruder. The extruder forms a rubber tube around a continuous nylon mandrel. The external dimension of the tube is determined by a die placed at the head of the extruder. The nylon mandrel around which the tube is extruded assures that the inside dimensions of the tube will remain constant and will meet the SAE specification which requires the hose to be mandrel built. The nylon mandrel, which remains inside the rubber tube during the hose construction process, supports the tube as it is fabricated into hose.[3]

After a 12-hour cooling period, the rubber tube with the nylon mandrel inside it is put through a braiding machine where three layers of braid are applied. As the tube passes through the braiding machine, a series of bobbins revolve around it forming a braid of fabric yarn. Next the tube covered with the first fabric braid passes through a box where it picks up a rubber based liquid cement. A second braid made

---

**3.** It is to be noted that a "tube" as it is known within the industry is made of a single extruded compound rather than many materials and is never made on a flexible nylon mandrel.

of brass coated high carbon steel wire is applied on top of the rubber cement and the first layer of fabric braid. A strip of rubber which looks like a roll of friction tape is next laid on and surrounds the braid of wire. A third layer of braid, again consisting of a fabric yarn, is applied on top of the earlier braids and layers of rubber. After the hose passes through a latex dip, which impregnates the outer braid with a coating to protect against environmental conditions, the hose is rolled onto a large metal reel which can hold some 500 feet of hose.

After application of the two fabric and one steel braid and intervening layers of rubber cement, friction tape and latex dip, the hose is cured. First the uncured hose is unrolled and drawn through a lead press. The lead press extrudes billets of lead, under heat and hydraulic pressure, around the hose. The lead-sheathed hose is loaded onto a rather large reel which is put into a large autoclave or steam heater. The hose is then cured for approximately 30 minutes at 300 degrees Fahrenheit. As the hose is cured, the lead sheath forms a continuous external mold around the hose, and the nylon mandrel, which is still inside the middle rubber tube, expands. As a consequence, the hose is compressed between the nylon mandrel and external lead sheath giving it a solid construction with adhesion between component layers of the hose. The heat and pressure also cause the layer of rubber friction tape to flow into the layers of braid with the result that the curing process chemically cross-links the rubber into a state which will meet the SAE J1402 Type D specification requirements.

After curing, the exterior lead covering is peeled off the hose and the nylon mandrel is removed by blowing it out from the inside of the hose under water pressure. The hose is then proof pressure tested with water under specified pressure, and then passes through a printing machine.

The hose is next coiled on reels for shipment, and after passing various tests, including burst, adhesion, length change under pressure, periodic heat age, tolerance and general inspection tests required by the SAE J1402 Type D specification and by Goodyear of Canada and Paccar, the hose is released for shipment.[4]

The hose is marked by Goodyear of Canada with red lettering known as a "lay-line." Printed along one side of the hose is the "Dynacraft" name and a number identifying the date the hose was made. Also marked on the hose is the Dynacraft part number "1069" by which the hose is identified by the truck manufacturing plants, followed by a number which indicates the internal diameter of the hose. The Dynacraft catalogue describes this part number 1069 as "SAE 40R2 Type D [now J1402 Type D] Penn. State Approved for Air Brake Lines."

On the opposite side, and also in red lettering, appear: the letters "C.A." (which identify the hose as of Canadian origin); "Type D", the hose size expressed in a fraction; and the term "SAE J1402." These markings, repeated every fifteen inches along the length of the hose, are required by both the SAE specification J1402 Type D and by Paccar.

In addition to meeting the performance requirements imposed by the SAE specification J1402 Type D and the additional performance requirements imposed by plaintiffs, Goodyear of Canada is also required to obtain Pennsylvania approval for use of the imported hose as automotive equipment within that state. The Commonwealth of Pennsylvania's approval of products for use as automotive equipment is a standard recognized by the industry, and a prerequisite for use of the hose in the other states in the United States and Canada. The Commonwealth of Pennsylvania certified the subject hose for use as automotive equipment.

---

**4.** As noted above, the hose in its condition as imported is coiled on reels. In this condition, the hose is considered by plaintiffs to be "bulk hose" as distinguished from a "hose assembly" which was defined by a witness for plaintiffs as a "hose complete with fittings attached." As will be discussed later in more detail, the hose in a hose assembly must be cut to length. Plaintiffs, it is to be added, have never imported hose assemblies since their own manufacturing plants make their own assemblies.

Paccar, d/b/a Dynacraft Company, purchased the merchandise in question pursuant to a blanket purchase order entered into with Goodyear of Canada. The purchase order refers to "40R2D" hose which is now known as J1402 Type D and contains the prices and terms and conditions under which the hose is acquired from Goodyear. Under the purchase order, Goodyear agreed to maintain on hand at all times an inventory equal to 25 percent of plaintiff's annual requirements. However, usage of the hose by plaintiff grew so fast that Goodyear was not able to maintain an inventory.

All of the hose imported under the entries in question was used as original equipment; in fact, all hose imported by plaintiff from Goodyear of Canada is intended for original equipment use.

Plaintiff purchases the entire J1402 Type D hose production of Goodyear of Canada. Due to defects in weaving and for other reasons, the length of each piece of hose—which is referred to by plaintiff as "bulk hose"—varies. The bulk hose is imported in various lengths tied end-to-end with twine and rolled onto reels. There is a prescribed mix of various lengths of hose on each reel. Plaintiff requires that each roll contain 10 percent of the hose in lengths of 3 to 25 feet; 25 percent in lengths of 25 to 40 feet; and 65 percent in lengths of over 40 feet. The shorter lengths of hose are at the top of the reel to facilitate use of the hose in the plant.

The bulk hose arrives at the truck manufacturing plant in exactly the same condition as imported, namely on palletized bulk reels of random lengths of hose which are tied together by twine and covered with a polyethylene covering. When ready to be used, a reel of hose is carried by a lift truck to a holding rack, which is located in an area designated as the "hose assembly area" that is adjacent to the truck assembly line. The reason for locating the hose assembly area adjacent to the truck assembly line is that the trucks are custom-built and hence the lengths of the hose frequently cannot be predetermined. Accordingly, for convenience and practicality, the hose assemblies are produced in an area close to the frame assembly. The foreman of the hose assembly area is given a "shopping list," i. e., a list of the lengths of hose and configurations of fittings needed by the lead man in the frame assembly area. If the length of hose needed is not to be found on the holding rack, and it usually is not, a workman pulls off a length of hose from the reel, measures it, and then cuts it to the desired length by use of a cut-off saw. Occasionally, a length of hose will correspond to a needed length as it is pulled off the reel, thus dispensing with the need for cutting to length.

Once cut to the necessary length, hose end fittings are attached to each end of the hose. Although most fittings are attached in the plant, about 15 percent of them are installed at the Lighthouse for the Blind in Seattle by legally blind and physically handicapped people. The fittings consist of a collar and an insert and nut. The collar fitting, which has threads on the inside, is screwed on over the end of the hose, with the interior threads of the collar interfacing with the exterior cover of the hose. The insert and nut, or in the case of the field reusable model, the insert alone, is tapered and threaded on the exterior. It is inserted inside the hose through the collar. The threads of the insert match those on the inside of the open end of the collar fitting. The insert is screwed through the collar into the hose, compressing and holding the hose between the insert on the inside and the collar on the outside.

There are two kinds of inserts, one of which is a two-piece or field-reusable fitting and may be installed or removed with the use of hand tools—a wrench and a vise. The other type of insert, usually applied in the factory, is a three-piece or factory-reusable fitting which consists of a loose nut and insert and requires the use of a mandrel to install.

The fittings on the hose perform the function of attaching the hose to various truck components, in which connection it is to be noted that all components of a truck

are attached to the finished vehicle by some means such as rivets, nuts, bolts, etc.

The imported hose is specifically designed for use in automotive air-brake lines for trucks, and more than 90 percent of the imported hose is actually used in air-brake systems. However, a small portion of the hose is used in the fuel lines and lubricating oil lines of Paccar trucks. The imported hose is used for these applications even though hose designed for fuel lines and lube lines costs half or less as much as the J1402 Type D hose. This is because the braking system of a highway truck is a critical safety system, and the air-brake hose is an integral part of that system. To avoid the possibility that a lower quality hose might be confused with an air-brake hose, Paccar, as a safety precaution, uses hose particularly designed for air-brake service for these other minor purposes in the trucks. The air-brake hose is more expensive than hose designed for lube oil and fuel oil lines because it is wire reinforced and has a higher resistance to heat. Hoses designed for lube oil and fuel oil lines would burst under pressures of between 300 and 800 pounds per square inch and could not be used as air-brake lines which withstand pressures of 7000 to 9000 pounds per square inch before bursting. The use of air-brake lines as lube and fuel lines is considered by plaintiff a misapplication of the hose and would not be used for those purposes if cost were the only consideration.

To the knowledge of the witnesses none of the J1402 Type D hose made for Paccar by Goodyear of Canada has ever been used in non-automotive uses.[5] Further, the hose is completely fabricated in Canada in which connection the parties stipulated that "the merchandise which is the subject of the instant action is fabricated 'hose', not 'tubing' or 'pipe'." The only thing done to the hose itself at the plant after importation is the cutting of it to length or the trimming of it to size[6] and the attachment of end fittings. As the hose arrives at the plant in its imported condition, it is fully capable of meeting the performance requirements required of it. The hose is still recognizable as the same hose and no change is made in the properties of the hose after installation in a new motor vehicle. Finally, the parties stipulated that the imported merchandise is a Canadian article within the meaning of general headnote 3(d) of the tariff schedules, which in relevant part defines the term as an article that is the product of Canada.

## II

The exemptions from duty provided by the Automotive Products Trade Act of 1965, 19 U.S.C. § 2001 *et seq.*, extend to merchandise meeting the following criteria set out in headnote 2(a), part 6B, schedule 6 of the tariff schedules:

1. It must be a Canadian article;

2. It must have been obtained from a supplier in Canada under or pursuant to a written order, contract, or letter of intent of a bona fide motor-vehicle manufacturer in the United States;

3. It must be a fabricated component; and

4. It must be intended for use as original equipment in the manufacture in the United States of a motor vehicle.

The parties stipulated that the hose is a Canadian article. The defendant's answer to plaintiffs' complaint admits that the hose is obtained from a supplier in Canada and that plaintiff Paccar is a bona fide motor vehicle manufacturer. Uncontradicted testimony establishes that the hose was obtained pursuant to a written order or contract, a blanket purchase order and shipping releases between Paccar, d/b/a Dynacraft, and Goodyear of Canada.

The witnesses testified that the intended use of the hose is original equipment in the

---

**5.** While hose such as here involved is physically suitable for use in a variety of non-automotive systems in transmitting gasses or liquids, its cost is such as to make such use commercially impractical.

**6.** Occasionally, as previously noted, the hose does not have to be cut at the plant when the length required corresponds to the length of hose as it comes off the reel.

manufacture of Peterbilt and Kenworth truck tractors by Paccar. In fact, all the hose imported under the entries in question was used as original equipment. The quantity of hose ordered from Goodyear of Canada and the dates of delivery are determined by the production of new Kenworth and Peterbilt tractors whose numbers have in the past and in particular in the year in question, 1971, exhausted Goodyear's supply of the subject hose.

Further, as noted previously, the parties have stipulated that the imported hose is "fabricated hose." In these circumstances, the only disputed issue (as indicated earlier) is whether the hose is a "fabricated component" as used in headnote 2(a), part 6B, schedule 6 of the tariff schedules and thus entitled to duty-free entry under item 772.-66.

On this question, plaintiffs contend that the imported hose is a "fabricated component" as that term is used in the tariff schedules. Defendant argues, on the other hand, that the imported hose is a mere material.[7] For the reasons that follow, it is concluded that the imported hose is a "fabricated component" and that plaintiffs' claim must therefore be sustained.

At the outset, it is to be noted that the term "fabricated component" contained in the Automotive Products Trade Act (enacted on October 21, 1965) was incorporated by the Congress into the tariff schedules *for the first time* only *two weeks earlier* when the same Congress amended item 807.00 to add the virtually identical term "fabricated components" to describe a class of United States products, the cost of which is excluded in determining the value upon which duties are applied when the completed article is returned to this country. More particularly, section 85 of the Tariff Schedules Technical Amendments Act of 1965 (P.L.

89–241, 79 Stat. 933, Oct. 7, 1965), amended item 807.00 to provide this favorable treatment to—

> Articles assembled abroad in whole or in part *of fabricated components,* the product of the United States, which (a) were exported, in condition *ready for assembly without further fabrication,* for the purpose of such assembly and return to the United States, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting. [Emphasis added.]

The leading case interpreting the term "fabricated components" is *General Instrument Corporation v. United States,* 480 F.2d 1402, 66 CCPA 178, C.A.D. 1106 (1973), reversing the decision of this court in 67 Cust.Ct. 127, C.D. 4263 (1971). In that case, anode foil, cathode foil, paper metal tabs, plastic insulating film, and cellophane tape were exported in rolls from the United States to Taiwan, where they were then cut to length and assembled into capacitors. The anode foil not only had to be cut to length, but also had to be trimmed to bring it into proper width. The production of the capacitor, considering only those operations involving the United States merchandise, involved *twelve* different steps which were described by the appellate court as follows (480 F.2d at 1404, 60 CCPA at 180–181):

> (1) cutting the anode foil to a specified length from the roll as imported, (2) cutting an anode tab to length from a roll of material, (3) staking the anode tab to the cut anode foil at right angles thereto, (4) interleaving paper and cathode foil from rolls with the anode foil strip and wind-

---

**7.** Elaborating on its contention that the hose is a material rather than a fabricated component, defendant's brief states (Br. pp. 15–16):

> The bulk hose is a material, which must undergo a lengthy process of further fabrication before it may be referred to as a hose assembly. Only the hose assembly is usable as a part on a motor vehicle. The hose,

itself, is imported in long bundles of hose, tied together, constituting a reel. Plaintiffs try to get the hose in as long lengths as possible. The hose is not marked—there being no indications where the hose should be cut. Cited case authority shows that this lack of pre-cutting, or even pre-marking, is an indicium of the hose's being material.

ing them into a roll with the paper between the cathode and anode foils, (5) staking a previously cut cathode tab to the cathode foil at right angles thereto, (6) placing a length of plastic film under the anode tab, (7) adding two or three turns to the rolled-up assembly and then cutting the interleaved paper and cathode foil from the rolls, (8) securing the rolled-up paper and foil assembly against unwinding by applying cellophane tape from a dispenser, (9) immersing the rolled-up assembly in a liquid electrolyte solution, (10) removing the capacitor roll from the electrolyte and welding the cathode lead to the inside of the can, (11) attaching the anode tab to the inside of a previously made rivet and washer assembly and (12) inserting the rolled-up assembly in the can thus finishing the capacitor.

Against this background, the appellate court (as previously noted) reversed the decision of this court and held that the various products on rolls constituted "fabricated components." It is to be added that in *General Instrument* this court had relied upon its earlier decision in *Amplifone Corporation v. United States,* 65 Cust.Ct. 58, C.D. 4054 (1970), in which it held that a "fabricated component" had to be a complete unit itself and not subject to any assembly other than direct installation in the final product. The court in *Amplifone* ruled that various products were not "fabricated components" for the following reasons (*id.* at 63):

. . . they are not in such a state of readiness at the time of exportation as to be capable of being incorporated into the coils, which, of course, is not the imported article. In such state, it may well be, for all the record shows, that each of the exported products in issue lends itself to usage for a hundred and one different purposes. In this state these products are at best described as fabricated products. It is only when they are subjected, while abroad in a foreign country, to measuring, cutting, winding, melting, etc., that these products can properly be described as component materials for

transformer coils. And it is only after the resultant products are incorporated into the coils that the coils themselves become components in a state of readiness for incorporation into the transformers.

The court in *Amplifone* concluded (*id.* at 64):

Under all the circumstances disclosed by this record we are of the opinion that the exported products do not come within the scope of the term "fabricated components, the product of the United States" as used in item 807.00 of the tariff schedules. As such, we are in accord with the argument advanced herein by defendant as hereinbefore noted and with the further argument recorded at page 12 of defendant's brief wherein it is stated ". . . the instant case involves the cutting and forming of *bulk materials* into *component parts, not* the mere *trimming* of *slight* amounts of excess material from an item already substantially completed." . . . [Emphasis in original.]

In the *General Instrument* case the Court of Customs and Patent Appeals rejected the rationale of the *Amplifone* case—the same argument advanced by the defendant in the case at bar—and, in reversing this court, held (as previously indicated) that the various products on rolls constituted fabricated components. The appellate court stated (480 F.2d at 1406, 60 CCPA at 182–183):

The Government agrees with the reasoning of the Customs Court and argues that the disputed articles were not "fabricated components." In our view, item 807.00 generally defines *"fabricated components" as those components of the whole product* which (a) were not subject to "further fabrication," (b) did not lose their physical identity during assembly and (c) were not advanced in value. *We do not think that the language "fabricated components" has the separate import for which the Government contends. The only reasonable interpretation of item 807.00 is that all elements that go into the imported final article which meet the conditions the item imposes on the fabri-*

*cated components are subject to the exclusion it provides.*

We find that all the articles in issue here meet those requirements. Concededly all are products of the United States and all went into the imported electrolytic capacitors. *The meaning of "fabricated" is broad and without doubt applies to the rolls of foil, paper, cellophane tape and plastic insulating film which obviously were manufactured articles.* The articles did not lose their physical identity in the capacitor "by change in form, shape or otherwise." . . . [Emphasis added.]

■ In these circumstances, the subject hose is clearly a "component," i. e., an element which goes into the final article, as the *General Instrument* court defined the term. Even if both parties had not stipulated as a matter of fact that the hose is "fabricated," the numerous products and manufacturing operations which are required to produce the hose would lead inescapably to that conclusion. As such, the subject hose can only be described as a "fabricated component."

■ The clear import of the *General Instrument* decision is that fabricated components include *all elements* "that go into the . . . final article which meet the conditions the item imposes on the fabricated components . . . ." The only condition which headnote 2(a), part 6B, schedule 6 of the tariff schedules imposes on "fabricated components" is that they be intended for use as original equipment in the manufacture in the United States of a motor vehicle. Further, "fabricated components" in headnote 2(a), part 6B, schedule 6, unlike "fabricated components" under item 807.00, need not be "ready for assembly without further fabrication." This is emphasized by the report of the House Ways and Means Committee on the Automotive Products Trade Act of 1965 which report states in part (H.Rep.No.537, 89th Cong., 1st Sess. (1965) p. 27):

. . . although at the time of importation the component does not have to be in a condition completely ready for assembly without further fabrication, it must at a minimum be so far processed as to be physically recognizable as a component in an unfinished state.

■ The merchandise in issue far exceeds the Committee report's standard of required fabrication. The report states that "at the time of importation the component *does not* have to be in a condition completely ready for assembly without further fabrication . . . .." The hose at bar is merely despooled and cut to length and the mere act of cutting does not change the state of the fabrication of the hose. Indeed the law is clear that the cutting to length does not constitute "further fabrication." Thus in *General Instrument, supra,* our appellate court stated (480 F.2d at 1406, 60 CCPA at 183–184):

There remains the matter of whether the items were exported "in condition ready for assembly without further fabrications." In *General Instrument Corporation v. United States,* 59 CCPA 171, 462 F.2d 1156, C.A.D. 1062 (1972), the court regarded that provision met by fine gold wire which was exported on spools and in assembly was bonded at the end to an aluminum strip on a semi-conductor chip and then severed. The paper in the present case, and the cathode foil in one form of capacitor, were cut to length after being at least partly assembled into the capacitor roll and thus met the provision in question in the same manner as the gold wire in the cited case. Although the anode foil, the cathode foil in some cases, the metal tabs and the Mylar film were cut to length before assembly with the other articles, we find no reason for considering them subject to any different treatment than the articles cut after assembly.. Trimming of the edges of the anode foil amounts to an operation incidental to the assembly process and not to "further fabrication" under item 807.00. See *C. J. Tower & Sons of Buffalo v. United States,* 62 Cust.Ct. 643, 304 F.Supp. 1187, C.D. 3840 (1969), wherein trimming the edges of a composite sheet assembled abroad was not found to bar treatment under item 807.00.

This court in *The Olga Company v. United States,* 71 Cust.Ct. 42, C.D. 4468 (1973), reached the same conclusion, holding that rolls of thread, lace, tape, and elastic, in continuous lengths on large spools constituted fabricated components ready for assembly without further fabrication even though they had to be cut to length before use. See also *General Instrument Corporation v. United States,* 499 F.2d 1318, 61 CCPA 86, C.A.D. 1128 (1974).

The short of the matter is that the hose in question is completely fabricated and ready for assembly without further fabrication. In this connection, not only did the parties stipulate that "the merchandise which is the subject of the instant action is fabricated 'hose' . . . ," all the witnesses agreed that the hose, as it is imported, is completely fabricated and that no further fabrication of the hose itself it performed after it arrives in the United States. There is no change in the physical or chemical properties of the hose after importation. After installation on a new truck it is still completely identifiable.

The House Ways and Means Committee report previously referred to requires that at the time of importation the item "must at a minimum be so far processed as to be physically recognizable as a component in an unfinished state." H.Rep.No.537, 89th Cong., 1st Sess. (1965) p. 27. In the case of the Paccar air-brake hose, the fact that it is a component is not only immediately apparent from the product's very nature, but is emblazoned in red legends running the length of the hose. On one side of the hose these announce to the world that it is "Type D, SAE J1402" hose; on the other, Paccar's trade name "Dynacraft" is alternated with the company's part number assigned to the product, "1069". The SAE nomenclature "Type D, SAE J1402" identifies the hose throughout the industry as a specific product—automotive air-brake hose—which has been made in conformance with and meets the performance requirements set forth in the specifications established by the Society of Automotive Engineers. The company's part number, "1069", identifies the item for the Kenworth and Peterbilt divisions of Paccar as one particular truck component.

In sum, at the time of its importation, the hose at bar is a completely finished component and is immediately recognizable as such. It more than meets the requirements of the Ways and Means Committee report to qualify as a "fabricated component." Defendant, however, points out that this Ways and Means Committee report also states (*id.* at 27):

> The term "fabricated component" is a term of limitation which embraces finished or unfinished components actually incorporated into a motor vehicle. The term does not, however, include materials, such as metal plate, sheet, strip, wire, *pipes and tubes,* and textile piece goods. In other words, although at the time of importation the component does not have to be in a condition completely ready for assembly without further fabrication, it must at a minimum be so far processed as to be physically recognizable as a component in an unfinished state. [Emphasis added.]

With respect to this report, defendant argues that "hose" is similar to "pipes and tubes." Therefore, according to defendant, the hose involved is covered by the words "pipes and tubes" which the report states are materials and thus are not included within the purview of "fabricated components." In point of fact, contrary to defendant's conclusion, the subject merchandise is not "tube" or "pipe." The stipulation of fact entered into between the parties to this litigation states in part: "The merchandise which is the subject of the instant action is fabricated 'hose,' not 'tubing' or 'pipe'."

In a related vein, defendant asserts that "[i]n the case of items 772.65 and 772.-66, . . . it is clear that hose *with* its fittings was intended to be covered by item 772.66, while hose without its fittings (and similar pipe and tubing) was not intended to be encompassed in item 772.66 even though falling within the scope of item 772.65." (Br. p. 32, emphasis in original.) However, if Congress intended that hose

without fittings not be classified as a fabricated component it would have so specified. For example, fabrications of wire are classifiable under the Automotive Products Trade Act free provision only if "fitted with fittings, or made up into articles," items 642.20 and 642.21. On the other hand, the specific language of items 772.65 and 772.66 provides a duty-free classification for "hose . . . *with or without attached fittings*." Further, the House Ways and Means Committee report previously referred to states, at page 27, in pertinent part, "the component does not have to be in a condition completely ready for assembly without further fabrication . .." At most, the attachment of fittings is an *assembly* process, rather than a fabrication of the hose, a fact impliedly recognized by the defendant's own characterization of the hose with fittings attached as a "hose assembly" and its description of the attachment of the fitting as an "assembly operation." (Br. p. 37)

■ It is to be added that the act of assembling a product does not constitute further fabrication. *General Instrument Corporation v. United States, supra,* 499 F.2d 1318, 61 CCPA 86; *General Instrument Corporation v. United States, supra,* 480 F.2d 1402, 60 CCPA 178. Moreover, the defendant's argument that only air-brake hose assemblies are "fabricated components" (Br. pp. 21–22, 32–33) is the same sub-assembly or dual-assembly argument the defendant advanced in *General Instrument Corporation, supra,* 480 F.2d 1402, 60 CCPA 178, and which our appeals court rejected. *General Instrument Corporation, supra,* 480 F.2d 1402, 60 CCPA at 182.

The *Harding* cases cited by defendant (*United States v. The Harding Co.,* 21 CCPA 307, T.D. 46830 (1933) and *The Harding Co. v. United States,* 23 CCPA 250, T.D. 48109 (1936)) have no relevance to the instant case. In the first *Harding* case, so-called brake linings made of asbestos, yarn and wire and imported in bales of running length were held to have been properly classified by the collector as a material, i. e., a manufacture of asbestos yarn rather than as parts of automobiles, finished or unfinished, as claimed by the importer. In the second *Harding* case, the record established that merchandise identical to that in the earlier case was used exclusively in the manufacture of brake linings for automobiles and was commercially unsuitable for other uses. Notwithstanding the exclusivity of use of the merchandise for automobile brake linings, the appellate court adhered to the conclusion that the merchandise was classifiable as a material, i. e., a manufacture of asbestos yarn and not a part of an automobile. In so finding, the court stated (23 CCPA at 253):

> Running through most of the decisions pertinent to the inquiry here, it is made clear that before imported merchandise shall be regarded as parts of an article *the identity of the individual article must be fixed with certainty.* This is not true in the case at bar, and we hold as we held in the former *Harding* case that the imported merchandise is material for making automobile brake linings and is not parts of automobiles. [Emphasis in original.]

■ Reliance upon the *Harding* cases is misplaced for several reasons. Unlike the present case, the *Harding* decisions involved the issue of what constituted an automobile "*part.*" Nowhere do these decisions consider the term "fabricated component." If Congress had intended to limit duty-free status to only automotive parts it would have so provided, since it was certainly aware of the following meaning of the term "parts" contained in general headnote 10(ij) of the tariff schedules: "A provision for 'parts' of an article covers a product solely or chiefly used as a part of such article. . . . ." On this aspect, a review of the tariff schedules shows that Congress intended a variety of Canadian articles to be eligible for duty-free treatment even though capable of many and diverse uses and thus not falling within the category of automotive "parts." For example, staples in strip form (item 646.20); rivets of base metal (items 646.40 and 646.41); cotters, cotter pins and fasteners or holders (except

nuts) used with screws, bolts or studs, of base metal (item 646.42); wood screws of base metal (items 646.49, 646.51 and 646.53); bolts, nuts, studs, screws and washers, screw eyes, screw hooks, and screw rings and turnbuckles not otherwise described in part 3D, schedule 6 (items 646.54 through 646.78, inclusive) are all entitled to duty-free treatment under item 646.79 if Canadian articles and intended for use as original equipment in a motor vehicle. From the foregoing, it is apparent that Congress meant the term "fabricated component" to be an inclusive term of far wider application than an automotive "part." [8]

 Finally, defendant argues that because it is potentially possible to utilize the subject hose in non-automotive uses, this affects the product's classification as duty free. But this ignores the clear language of headnote 2(d), part 6B, schedule 6 of the tariff schedules, *supra,* which only requires that the fabricated component be *intended* for use as original equipment in the manufacture in the United States of a motor vehicle. It does not require that the sole, exclusive or even chief use of the article be in motor vehicles or that the fabricated component be an automobile "part." The same point is made in the previously referred to Ways and Means Committee report which states at p. 27 that "the term 'fabricated component' is a term of limitation which embraces finished or unfinished components *actually incorporated* into a motor vehicle." [Emphasis added.]

 Beyond that, headnote 2(d), part 6B, schedule 6 allows duty-free entry conditional on the use of the item as original equipment in the manufacture of motor vehicles. If the imported item is diverted from its intended use, it, or its value, is subject to forfeiture unless, at the time of diversion, the Customs Service is notified in writing and arrangements are made either to destroy or export the article or to pay the appropriate duty which would have applied if the article had not been entered duty free under the Automotive Products Trade Act.

 In summary, the only cases construing the meaning of the phrase "fabricated components" are the General Instrument cases, *supra,* which are not only relevant, but virtually dispositive of the case at bar. In fact (as mentioned previously) the standard required of a "fabricated component" before it is accorded favorable duty-free status as American goods returned under the General Instrument decisions is more rigorous than that required of goods qualifying under the Automotive Products Trade Act. For example, to be classified as duty free in the context of American goods returned, the fabricated component must be "ready for assembly without further fabrication" (item 807.00), while a fabricated component under the Automotive Products Trade Act qualifies for free treatment although not "completely ready for assembly without further fabrication." H.Rep.No. 537, p. 27. In addition, it must be concluded that the term "fabricated components" has the same meaning whether used in the context of American goods returned or the Automotive Products Trade Act. This is particularly true when it is considered that the phrase originated in both areas at about the same time, for the Automotive Products Trade Act of 1965 and the Tariff Schedules Technical Amendments Act of 1965 were both enacted by the *same* Congress within two weeks of each other.

For the reasons stated, it is held that the imported hose is a fabricated component and therefore entitled to duty-free entry under item 772.66. Plaintiffs' claim is therefore sustained and judgment will be entered accordingly.

---

**8.** It is not without significance that the Automotive Products Agreement itself, *supra,* distinguishes between "parts" and "fabricated components" with Annex A pars. 1 (2, 4 and 6) making reference to "parts" and Annex B(2) making reference to "fabricated components."